USDC-SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC#:
DATE FILED: 5/22/2020

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

NUMSP, LLC,

                Plaintiff,

      v.

DAVID ST. ETIENNE, KENNETH A.
RAYMOND, DULYMUS "DEUCE"
MCALLISTER, AND PROTEK SOLUTIONS,
INC.,

                Defendants.

---

20-CV-2916 (RA)

OPINION & ORDER

RONNIE ABRAMS, United States District Judge:

Plaintiff NuMSP, LLC filed this action against Defendants David St. Etienne, Kenneth Raymond, Dulymus "Deuce" McAllister, and ProTek Solutions, Inc., asserting claims for breach of contract, unfair competition, and misappropriation of trade secrets, among others. Now before the Court is NuMSP's motion for a temporary restraining order and preliminary injunction, St. Etienne's motion to dismiss and/or compel arbitration, Raymond's motion to dismiss, and McAllister and ProTek's joint motion to dismiss. For the reasons that follow, the Court grants the motions to dismiss for lack of personal jurisdiction filed by Defendants Raymond, McAllister, and ProTek; denies St. Etienne's motion to dismiss but grants his motion to compel arbitration; and denies NuMSP's motion for a temporary restraining order and preliminary injunction.

BACKGROUND[1]

## I.   NuMSP's Purchase of St. Etienne's Business

Plaintiff NuMSP, LLC is a "leading provider of information technology ('IT') consulting services for businesses."  Compl. ¶ 8.[2]  In 2018, NuMSP identified Ultimate Technical Services, Inc. ("UTSI"),[3] a Louisiana-based IT consulting business founded in 1984 by Defendant David St. Etienne, as a "potential acquisition target."  *See id.* ¶¶ 11-13; St. Etienne Decl. ¶¶ 4-5.  Thereafter, NuMSP began negotiating with St. Etienne "to buy his business."  Compl. ¶ 13.

### A.  The Asset Purchase Agreement

On December 3, 2018, NuMSP, UTSI, and St. Etienne entered into an Asset Purchase and Sale Agreement (the "APA"), through which NuMSP agreed to purchase UTSI from St. Etienne for a total of $1,004,000.  *See* Compl. Ex. B (APA) §§ 1.1, 3.1; *see also* Compl. ¶ 14.  NuMSP agreed to pay $848,587 to St. Etienne at Closing,[4] and $150,000 one year later, assuming "certain post-closing conditions were met."  *See* Compl. ¶ 15.  In purchasing St. Etienne's Business,[5] NuMSP purchased "all the assets of the Business either owned by [UTSI] or essential to the operation of the Business," including "all goodwill in or arising from the Business as a going concern" and all of UTSI's customer relationships, customer contracts, and customer good will.

---

[1] The following facts are drawn primarily from NuMSP's Complaint, Dkt. 1 ("Compl.") and the exhibits attached thereto.  Where applicable, the Court also relies on the parties' affidavits submitted in connection with the motions, which it may do when considering a Rule 12(b)(2) motion to dismiss.  *See, e.g., Commodity Futures Trading Comm'n v. TFS-ICAP, LLC*, 415 F. Supp. 3d 371, 380 (S.D.N.Y. 2019); *Seiden v. Schwartz, Levitsky, & Feldman LLP*, No. 16-CV-5666 (RA), 2017 WL 2591785, at *1 n.1 (S.D.N.Y. June 14, 2017).

[2] NuMSP is a Delaware limited liability company with its principal place of business in New Jersey.  *See* Compl. ¶ 1.  Its members are citizens of New Jersey, Minnesota, and/or New Zealand.  *See id.*  Defendants St. Etienne, Raymond, and McAllister are all citizens and residents of Louisiana.  *See id.* ¶¶ 2-4.  Defendant ProTek is a Louisiana corporation with its place of business in Louisiana.  *See id.* ¶ 5.

[3] The Complaint refers to UTSI as "Ultimate Technology Services, Inc."  *See* Compl. ¶ 11.

[4] The "Closing Date" is defined in the APA as December 3, 2018.  *See* APA § 2.

[5] "Business" is defined in the APA's Recitals as UTSI's "IT managed services business, which primarily serves customers in the New Orleans, Louisiana metropolitan area and the surrounding suburban area."

2

*See* Compl. ¶ 15; APA § 1.1.  NuMSP alleges that, in order to "protect NuMSP's interests in the business and customer relationships that it was buying," St. Etienne also agreed "as part of the sale transaction that he, both directly and indirectly through any other person or entity, would refrain for a three-year period ending in December 2021 from competing against NuMSP within Louisiana and from soliciting any of NuMSP's customers."  Compl. ¶ 17.  In particular, pursuant to Section 5 of the APA, St. Etienne agreed to deliver to NuMSP "Noncompetition Agreements" signed by UTSI and St. Etienne "with the restrictive covenants contained in Section 15 of this Agreement." *See* APA § 5.1(g).  Section 15, in turn, provides that, for a period of three years from the Closing Date, the "Seller Parties"—defined to include UTSI and St. Etienne together—and/or "any other entity owned in full or part directly or indirectly by the Seller Parties" shall not compete with NuMSP within the state of Louisiana or solicit any of NuMSP's customers.  *See* APA §§ 15.1, 15.3, 15.4.

The APA contains a New York choice of law provision, as well as a mandatory arbitration provision.  First, the APA provides that it "shall be governed by and construed in accordance with the laws of the State of New York applicable to agreements made and to be performed wholly within such jurisdiction, without giving effect to the provisions, policies, or principles thereof relating to choice or conflict of laws."  *See* APA § 18.3.  Second, it provides that "[a]ny controversy or claim arising out of this Agreement will be settled by binding arbitration before a single arbitrator in New York, New York" in accordance with the American Arbitration Association's rules for commercial disputes, and that the "resolution of any controversy or claim as determined by the arbitrator will be binding on the Parties."  *See* APA § 18.4.  Section 18.4 provides further that a party "may seek from a court an order to compel arbitration, or any other interim relief or provisional remedies pending an arbitrator's resolution of any controversy or claim," and that

"[a]ny such action or proceeding will be arbitrated within the jurisdiction of the state or Federal courts located in New York, New York." *Id.*

In Section 17 of the APA, the parties expressly acknowledged that "damage remedies available at law for any breach of this Agreement . . . will not be adequately compensated by monetary damages alone due to the difficulty of assessing such damages," and that therefore, the non-breaching party would be entitled to "obtain injunctive relief or other equitable relief to restrain a breach or threatened breach of this Agreement or to specifically enforce this Agreement, without proving that any monetary damages have been sustained."  APA § 17.

Finally, the APA provides that "[a]ll Schedules and other attachments or Closing Date documents signed referenced in this Agreement are part of this Agreement and are incorporated herein by reference," *see* APA § 18.11, and that the APA, "with its Schedules and all related Closing Date transaction documents[,] constitutes the entire agreement among the Parties and supersedes any prior agreement or understanding, whether oral or written, among the Parties concerning its subject matter," *see* APA § 18.12.

**B.  The Non-Compete Agreement**

According to the Complaint, St. Etienne executed and delivered to NuMSP a separate Non-Compete Agreement "[a]s further protection for the assets and the business that NuMSP was purchasing from St. Etienne" and "in connection with the closing of the [APA]."  Compl. ¶ 21. Specifically, the "Non-Compete, Nonsolicitation and Assignment Agreement," also dated December 3, 2018, was entered into between NuMSP and St. Etienne.  *See* Compl. Ex. A (Non-Compete).  The parties expressly acknowledged in the Non-Compete Agreement that NuMSP "would not purchase" UTSI from St. Etienne "without the additional protection and consideration

provided by" the Non-Compete Agreement.  *See* Compl. ¶ 22; Non-Compete at 1.  As such, the Non-Compete Agreement was "attached to the APA."  *See* St. Etienne Decl. ¶ 11.[6]

The Non-Compete Agreement provides that "[i]n consideration of the payments" made to St. Etienne under the APA, he agreed, for a three-year period after the APA's Closing Date, not to "directly or indirectly either individually, in partnership, jointly, or in conjunction with any Person, firm, or entity" compete with NuMSP or solicit NuMSP's customers.  *See* Non-Compete § 1.  St. Etienne also agreed not to "use, reveal or divulge" any of NuMSP's "Confidential Information" "at any time after execution" of the Agreement, nor any "Trade Secret" "at any time during or after the term of this Agreement."  *See* Non-Compete §§ 2, 3.

The Non-Compete Agreement contains a New York choice of law provision, providing that "[t]his Agreement shall be governed under the laws of the state of New York, without regard to conflict of law principles," and a New York forum selection clause, providing that "[a]ny permissible action at law, suit in equity, or other judicial proceedings for the enforcement of this Agreement, or related to any provision of this Agreement, shall be instituted only in a federal or state court located in New York, New York, except that [NuMSP] may seek injunctive relief in any court having jurisdiction for any claim relating to the alleged misuse or misappropriation of [its] trade secrets or Confidential Information or proprietary information."  Non-Compete § 8.  Pursuant to the Non-Compete Agreement, St. Etienne also "expressly consent[ed] to venue and personal jurisdiction of the federal or state courts as set forth in this Section 8 for any lawsuit filed there against [him] by [NuMSP] arising from or relating to this Agreement."  *Id.*  St. Etienne agreed further that, in the event that he "breaches or threatens to breach any of the restrictive covenants

---

[6] Additionally, the preamble to the Non-Compete Agreement states that "[c]apitalized terms not defined herein shall have the meaning given to them in the Asset Purchase and Sale Agreement dated December 3, 2018 between [NuMSP] and the Seller Parties."

contained herein, [NuMSP] shall be entitled to specific performance, or immediate temporary, preliminary, and/or permanent injunctive relief, as well as money damages insofar as they can be determined." *See* Non-Compete § 5.

## II.  Employment at NuMSP and Non-Disclosure Agreements

NuMSP asserts that, following its purchase of UTSI, it hired St. Etienne as a "Project Sales Manager" to "sell new projects and products to the customer base that NuMSP just purchased from him."[7]  *See* Compl. ¶ 28.  It also hired Defendant Kenneth Raymond, a former UTSI employee, as a "Business Development Manager" to "bring new managed service customers to NuMSP."  *See id.*  Raymond had previously worked at UTSI for "a little more than two years as a sales associate." *See* Raymond Decl. ¶ 4.  "[I]n connection with their employment with NuMSP," and in order to "protect the confidentiality" of NuMSP's confidential information and trade secrets, St. Etienne and Raymond each executed and delivered to NuMSP a "Confidentiality, Non-Disclosure and Employee Covenants Agreement" (together, the "NDAs").  *See* Compl. ¶ 30; Compl. Ex. D (St. Etienne NDA); Compl. Ex. E (Raymond NDA).[8]

As relevant to the instant dispute, the terms of the two NDAs are substantively the same. The NDAs provide that St. Etienne and Raymond were each an "at will employee," meaning that NuMSP could "terminate the employment relationship with [them] at any time, for any reason and with or without cause," and that they could "resign at any time without notice or cause."  *See* NDAs § 7.  Pursuant to these agreements, St. Etienne and Raymond agreed not to "use or disclose to any person or entity" any of NuMSP's Confidential Information, "whether during or after

---

[7] Pursuant to the APA, NuMSP agreed to hire certain UTSI employees, including St. Etienne, after the transaction closed.  *See* APA § 6.9; St. Etienne Decl. ¶ 9.

[8] St. Etienne's NDA is dated December 3, 2018, *see* Compl. Ex. D, while Raymond's is dated December 4, 2018, *see* Compl. Ex. E.

employment" with NuMSP.  *See* NDAs § 2.  "Confidential Information," as defined in Section 1 of the NDAs, includes "customer lists and other confidential customer data."  *See* NDAs § 1(a). St. Etienne and Raymond also agreed that "for so long as [they] shall remain employed by [NuMSP] and for a period of twelve (12) months after termination of employment with [NuMSP] for any reason," they would not "directly or indirectly" solicit any of NuMSP's employees or independent contractors, nor would they "provide any services to any other person, company, entity or firm while employed by [NuMSP] without [NuMSP's] written consent" or "do anything that may result in an actual or perceived conflict of interest" to NuMSP.  *See* NDAs § 5.  St. Etienne and Raymond agreed further that, upon termination, they shall "immediately turn over to [NuMSP] all documents, papers, [] property or other materials in [their] possession or under [their] control" that "may contain or be derived from [NuMSP's] Confidential Information," and that they "shall not retain any copies or reproductions of" any such materials.  *See* NDAs § 3.

The NDAs contain a New Jersey choice of law provision, providing that "[t]his Agreement shall be interpreted in accordance with the laws of the State of New Jersey," and a New Jersey forum selection clause, providing that "[t]he parties consent to the exclusive jurisdiction of the courts of New Jersey."  *See* NDA § 8.  Both St. Etienne and Raymond also acknowledged that "disclosure of any Confidential Information or breach of the covenants" in their NDAs would "give rise to irreparable injury" to NuMSP, that "money damages may be an inadequate remedy for any such breach," and that NuMSP may therefore "seek and obtain injunctive relief against the breach or threatened breach of this Agreement in addition to any other legal remedies which may be available to it."  *See* NDAs § 6.

## III.   Alleged Conspiracy and Formation of ProTek

According to NuMSP, in or around December 2019, it advised St. Etienne that "he was not entitled to [the] additional $150,000 payment" contemplated under the APA "because the

7

contractually agreed-upon condition for this payment (*i.e.*, sustaining 80% of the prior twelve months of revenue) had not been satisfied."  Compl. ¶ 36.  NuMSP alleges that St. Etienne became "dissatisfied with the deal he had negotiated with NuMSP," and thereafter "conspired with" Defendants Raymond, Dulymus McAllister, and ProTek Solutions, Inc. to "wrongfully compete with NuMSP and steal the very customers and business that [he] previously sold to NuMSP."  *Id.* ¶ 37.

ProTek, a Louisiana corporation founded on January 9, 2020, is an IT consulting business and "direct competitor of NuMSP."  *See id.* ¶¶ 38-40; McAllister Aff. ¶ 10; Compl. Ex. F (ProTek Registration).  ProTek's only office is located in Louisiana, and "all of its business is conducted inside the New Orleans Metropolitan Area."  McAllister Aff. ¶ 10.  McAllister is identified as ProTek's "sole officer and agent."  Compl. ¶ 38.  NuMSP contends that during their employment with NuMSP, St. Etienne and Raymond "conspired with McAllister and ProTek to wrongfully divert NuMSP's customers and business opportunities to ProTek, in direct violation of St. Etienne's and Raymond's contractual and common law obligations to NuMSP."  *Id.* ¶ 41; *see also id.* ¶¶ 42-50.  In particular, St. Etienne and Raymond allegedly solicited "the very customer relationships that St. Etienne had sold to NuMSP" and "which he agreed to refrain from soliciting through December 2021," *id.* ¶ 60, 69, "induced a number of customers to terminate their contracts with NuMSP and diverted their business to McAllister and ProTek," *id.* ¶ 70, and "misappropriated NuMSP's confidential customer list, which they continue to possess" following their terminations, *id.* ¶ 71; *see also id.* ¶¶ 55-56 (alleging that St. Etienne and Raymond misappropriated NuMSP's "confidential customer list," and that all four Defendants "already have used – and intend to continue using – NuMSP's confidential customer list to target, solicit and steal NuMSP's customers"); *id.* ¶¶ 57-58 (alleging that St. Etienne and Raymond wrongfully solicited certain of

8

NuMSP's customers, including ten customers that cancelled their contracts with NuMSP and "mov[ed] their business to ProTek").

NuMSP alleges further that McAllister is a "former professional football player" with "no prior experience in the IT consulting industry," *id.* ¶ 40, and that "St. Etienne and McAllister are long-time friends," *id.* ¶ 38.[9]  McAllister, however, asserts that he has "done consulting work for many companies" and, in terms of forming ProTek, "saw the I.T. market around New Orleans as a good opportunity based, in part, on the level of dissatisfaction [his] contacts had with NuMSP and other local firms."  McAllister Aff. ¶ 11.  He maintains that he has been "heavily involved in the [IT] industry for at least five years," and has "worked as an independent consultant to secure I.T. contracts for multiple I.T. service provides."  *Id.* ¶ 12.  He also asserts that his professional football career ended in 2009.  *See id.* ¶ 3.

As to the relationship between the Defendants, St. Etienne maintains that he is "not an employee or a consultant for ProTek," has "no formal relationship to ProTek," other than being "aware of its existence," has no "financial interest" or "ownership interest" in ProTek, and does not own any of its stock.  *See* St. Etienne Decl. ¶ 31.  Raymond asserts that he had not "even heard of" ProTek prior to "early March 2020," when his former colleague updated her LinkedIn profile to indicate that she was working for the company.  *See* Raymond Decl. ¶ 18.  Raymond asserts further that he has "no connection to ProTek," is "not an employee of ProTek," has "never interviewed at ProTek," has "no ownership or financial interest in ProTek whatsoever," and has no relationship with McAllister.  *See id.* ¶¶ 19-20.  McAllister contends that neither St. Etienne nor Raymond "have the authority to bind Protek to a contract," that ProTek does not maintain any business record with a contract signed by either St. Etienne or Raymond, that no client of ProTek

---

[9] St. Etienne asserts that McAllister is "a casual acquaintance," not a "long-time friend."  *See* St. Etienne Decl. ¶ 30.

has signed a contract "endorsed by" St. Etienne or Raymond, and that neither St. Etienne nor Raymond "has been, or will be, paid anything for any client that left NuMSP for Protek." *See* McAllister Aff. ¶¶ 19-21.

## IV.   Terminations of St. Etienne and Raymond

According to the Complaint, NuMSP became "suspicious of St. Etienne's and Raymond's activities" in late March 2020.  Compl. ¶ 61.  Around this time, St. Etienne and Raymond both allegedly "destroyed evidence and stole company property in an effort to cover their tracks."  *Id.* On March 26, 2020, NuMSP was apparently notified that, "notwithstanding COVID 19 lockdown restrictions, St. Etienne and Raymond were at the company's offices and were in the process of destroying company files and records."[10]  *Id.* ¶ 62.  NuMSP contends that it "immediately terminated St. Etienne's and Raymond's employment with the company as of March 26, 2020" as a result of this incident and "based on NuMSP's contemporaneous discovery of the Defendants' misconduct."  *Id.* ¶ 63.  NuMSP also alleges that, following their terminations, neither St. Etienne nor Raymond "returned the misappropriated customer list to NuMSP."  *Id.* ¶ 68.

## PROCEDURAL HISTORY

NuMSP initiated this action on April 8, 2020 by filing a complaint, *see* Dkt. 1, and a motion for a temporary restraining order and preliminary injunction, *see* Dkt. 2.  The parties subsequently met and conferred, proposed a briefing schedule on NuMSP's motion and any cross-motions to be filed by Defendants, and set forth terms to maintain the status quo pending resolution of NuMSP's motion, which the Court so-ordered on April 15, 2020.  *See* Dkt. 6.  On April 24, 2020, Defendants filed the following motions: Defendant St. Etienne moved to dismiss pursuant to Federal Rules of

---

[10] St. Etienne asserts that, on March 26, 2020, he was at NuMSP's offices "collecting mail and gathering work materials to bring home so that [he] could continue working remotely from home during the Covid-19 pandemic." *See* St. Etienne Decl. ¶ 37.  Raymond does not specifically address this claim in his Declaration.

Civil Procedure 12(b)(2), 12(b)(3), 12(b)(4), 12(b)(5), and 12(b)(6), or alternatively, to compel arbitration and stay this action, *see* Dkt. 10; Defendant Raymond moved to dismiss pursuant to Federal Rules of Civil Procedure 12(b)(2), 12(b)(3), 12(b)(4), 12(b)(5), and 12(b)(6), *see* Dkt. 11; and Defendants McAllister and ProTek filed a joint motion to dismiss "pursuant to Federal Rule of Civil Procedure 12(b)(6) for lack of personal jurisdiction," *see* Dkt. 14, which they subsequently clarified should be construed as a motion to dismiss pursuant to both Rule 12(b)(2) and Rule 12(b)(6).[11]  On April 24, 2020, Defendants St. Etienne and Raymond also filed an opposition to NuMSP's motion for a temporary restraining order and preliminary injunction. *See* Dkt. 12.[12]  On May 1, 2020, NuMSP filed a reply in support of its motion, *see* Dkt. 18, and an opposition to Defendants' motions to dismiss, *see* Dkt. 19.  Defendants filed replies to their respective motions on May 8, 2020.  *See* Dkts. 37, 38, and 42.  The Court held oral argument on the motions on May 14, 2020.  *See* Dkt. 47 ("Tr.").

## LEGAL STANDARDS

"[A] district court must generally . . . establish that it has federal constitutional jurisdiction" before considering other grounds for dismissal.  *See All. for Envtl. Renewal, Inc. v. Pyramid Crossgates Co.*, 436 F.3d 82, 85 (2d Cir. 2006).  "[T]his principle applie[s] equally to personal jurisdiction" as personal jurisdiction is "an essential element" of a district court's jurisdiction, "without which the court is powerless to proceed to an adjudication."  *Mones v. Commercial Bank of Kuwait, S.A.K.*, 204 F. App'x 988, 989 (2d Cir. 2006) (citation omitted); *see also, e.g.*, *Yellow Page Sols., Inc. v. Bell Atl. Yellow Pages Co.*, No. 00 Civ. 5663, 2001 WL 1468168, at *3 (S.D.N.Y.

---

[11] Due to technical errors with their filings, St. Etienne subsequently refiled his motion and supporting papers at Dkts. 31-32, Raymond refiled his motion and supporting papers at Dkts. 39-40, and McAllister and ProTek refiled their joint motion and supporting papers at Dkts. 33-36.

[12] Defendants McAllister and ProTek did not file a separate opposition to NuMSP's motion, but their joint motion to dismiss contains certain arguments in opposition to NuMSP's requested injunctive relief.  *See, e.g.*, Dkt. 14-1 at 21-30.

Nov. 19, 2001) ("Jurisdiction is a threshold matter, and must precede a determination on the merits."). As such, the Court will first address Defendants' motions to dismiss for lack of personal jurisdiction.

On a 12(b)(2) motion to dismiss, the plaintiff bears the burden of establishing personal jurisdiction over the defendant. *See Penguin Grp. (USA) Inc. v. Am. Buddha*, 609 F.3d 30, 34 (2d Cir. 2010). Where the parties have not engaged in discovery, as here, a plaintiff seeking to defeat a motion to dismiss based on the lack of personal jurisdiction need only make a prima facie showing that jurisdiction exists. *See Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.*, 722 F.3d 81, 84-85 (2d Cir. 2013). Such a showing is made where the plaintiff's "own affidavits and supporting materials, contain[] an averment of facts that, if credited, would suffice to establish jurisdiction over the defendant." *S. New England Tel. Co. v. Global NAPs Inc.*, 624 F.3d 123, 138 (2d Cir. 2010) (quoting *Whitaker v. Am. Telecasting, Inc.*, 261 F.3d 196, 208 (2d Cir. 2001)). On a 12(b)(2) motion, the Court must "construe the pleadings and affidavits in the light most favorable to plaintiff[], resolving all doubts in [its] favor," *see Porina v. Marward Shipping Co.*, 521 F.3d 122, 126 (2d Cir. 2008), and must accept the allegations in the Complaint as true "to the extent they are uncontroverted" by defendants' affidavits, "which the district court may also consider," *see GlaxoSmithKline LLC v. Laclede, Inc.*, No. 18-CV-4945 (JMF), 2019 WL 293329, at *3 (S.D.N.Y. Jan. 23, 2019). The Court need not, however, "draw argumentative inferences in the plaintiff's favor" or "accept as true a legal conclusion couched as a factual allegation." *In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d 659, 673 (2d Cir. 2013) (citations omitted). Thus, "[t]he plaintiff in opposing a 12(b)(2) motion cannot rely merely on conclusory statements or allegations; rather, the prima facie showing must be 'factually supported.'" *Sullivan v. Jersey Strong Licensing LLC*, No.

18-CV-7753 (RA), 2019 WL 3066492, at *2 (S.D.N.Y. July 12, 2019) (alterations and citation omitted).

Personal jurisdiction is analyzed under a two-step inquiry.  First, the Court must determine whether the exercise of personal jurisdiction is proper under the laws of the forum state—here, New York.  *Best Van Lines, Inc. v. Walker*, 490 F.3d 239, 242 (2d Cir. 2007).  If so, the Court must then determine "whether the exercise of personal jurisdiction over the defendant comports with the Due Process Clause of the United States Constitution."  *Sonera Holding B.V. v. Cukurova Holding A.S.*, 750 F.3d 221, 224 (2d Cir. 2014).  "In diversity cases, the issue of personal jurisdiction is governed by the law of the forum state, here, . . . New York's long-arm statute, . . . so long as the district court's exercise of jurisdiction comports with the requirements of due process."  *D.H. Blair & Co. v. Gottdiener*, 462 F.3d 95, 104 (2d Cir. 2006).

## DISCUSSION

### I.    Defendant St. Etienne's Motion

NuMSP alleges that the Court has personal jurisdiction over all of the Defendants "because the conduct of the Defendants is the subject of a valid contractual, forum selection provision that designates the state and federal courts in New York, New York as the exclusive forum for all disputes and consents to this Court's exercise of personal jurisdiction."  *See* Compl. ¶ 7.  In support of this allegation, NuMSP cites Section 8 of St. Etienne's Non-Compete Agreement, which does indeed contain a New York forum selection clause.  *See* Non-Compete § 8.  St. Etienne, on the other hand, asserts two main arguments for dismissal based on lack of personal jurisdiction.  First, he contends that because the APA, the Non-Compete Agreement, and his NDA are "all employment agreements," these agreements, and the forum selection clauses contained therein, are unenforceable and void under Louisiana state law.  *See* St. Etienne Mot. at 6-7.

"Alternatively," he asserts that the APA's mandatory arbitration provision requires that NuMSP's claims against him be brought in arbitration. *See id.* at 7-8.

## A.  Personal Jurisdiction

It is well established that "[p]arties can consent to personal jurisdiction through forum-selection clauses in contractual agreements." *D.H. Blair*, 462 F.3d at 103; *see also Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 n.14 (1985) (explaining that "because the personal jurisdiction requirement is a waivable right, there are a variety of legal arrangements by which a litigant may give express or implied consent to the personal jurisdiction of the court," such as by "stipulat[ing] in advance to submit their controversies for resolution within a particular jurisdiction") (internal quotation marks and citations omitted).  "Where an agreement contains a valid and enforceable forum selection clause, . . . it is not necessary to analyze jurisdiction under New York's long-arm statute or federal constitutional requirements of due process." *Gordian Grp., LLC v. Syringa Expl., Inc.*, 168 F. Supp. 3d 575, 581 (S.D.N.Y. 2016) (citation omitted). This is because "[a]n enforceable forum selection clause amounts to consent to personal jurisdiction." *Id.* (citation omitted).

### 1.  The Forum Selection Provisions are Valid and Enforceable

In analyzing whether it has personal jurisdiction over St. Etienne, the Court must begin by looking at the forum selection provisions contained in the agreements he executed with NuMSP. As an initial matter, enforcement of these forum selection clauses is governed by federal law. *See Martinez v. Bloomberg LP*, 740 F.3d 211, 220 (2d Cir. 2014) ("Questions of . . . the *enforcement* of forum selection clauses are essentially procedural, rather than substantive in nature, and therefore should be governed by federal law.") (quoting *Jones v. Weibrecht*, 901 F.2d 17, 19 (2d Cir. 1990) (per curiam)) (internal quotation marks omitted); *see also Phillips v. Audio Active Ltd.*, 494 F.3d 378, 384 (2d Cir. 2007) ("[F]ederal law should be used to determine whether an otherwise

mandatory and applicable forum clause is enforceable . . . because enforcement of forum clauses

is an essentially procedural issue[.]"); *Union Capital LLC v. Vape Holdings Inc.*, No. 16-cv-1343

(RJS), 2016 WL 8813991, at *2 (S.D.N.Y. Mar. 9, 2016) ("In suits such as this, that invoke federal

diversity jurisdiction, 'federal law applies to the interpretation of forum selection clauses," since

'questions of venue and the enforcement of forum selection clauses are essentially procedural,

rather than substantive, in nature.") (quoting *Magi XXI, Inc. v. Stato della Citta del Vaticano*, 714

F.3d 714, 721 (2d Cir. 2013)).[13]   To determine whether a forum selection clause is valid and

enforceable, courts consider: "(1) whether the clause was reasonably communicated to the party

resisting enforcement; (2) whether the clause is mandatory or permissive, i.e., . . . whether the

parties are required to bring any [] dispute to the designated forum or simply *permitted* to do so;

and (3) whether the claims and parties involved in the suit are subject to the forum selection

clause." *Martinez*, 740 F.3d at 217 (quoting *Phillips*, 494 F.3d at 383) (internal quotation marks

omitted).  "If the forum clause was communicated to the resisting party, has mandatory force and

covers the claims and parties involved in the dispute, it is presumptively enforceable," and "[a]

party can overcome this presumption only by (4) making a sufficiently strong showing that

enforcement would be unreasonable or unjust, or that the clause was invalid for such reasons as

---

[13] Because the Court applies federal law to determine the enforceability of the forum selection provisions here, it need not address Defendants' arguments that, under Louisiana state law, the agreements—including their forum selection provisions—are "void" and "unenforceable."  Nor would Louisiana law apply to the interpretation of the provisions. In *Martinez v. Bloomberg*, the Second Circuit specifically distinguished "between the *interpretation* of a forum selection clause and the *enforceability* of the clause," holding that where a contract contains both a choice-of-law clause and a forum selection clause, "the substantive law identified in the choice-of-law clause governs the interpretation of the forum selection clause, while federal law governs the enforceability of the forum selection clause."  740 F.3d at 214, 217.  Here, despite the inconsistent forum selection provisions, both the APA and the Non-Compete Agreement contain clear New York choice of law provisions.  *See* APA § 18.3; Non-Compete § 8.  As such, while federal law governs the enforceability analysis, New York law applies to "interpretative questions."  *See Martinez*, 740 F.3d at 217-18; *see also id.* at 220 ("To ensure that the meaning given to a forum selection clause corresponds with the parties' legitimate expectations, courts must apply the law contractually chosen by the parties to interpret the clause.").  For reasons discussed below, St. Etienne's NDA is not the controlling agreement between the parties and thus the Court need not consider the New Jersey forum selection or choice of law provisions at this time. In any event, however, Louisiana state law plays no role in the analysis.

fraud or overreaching." *Id.* (quoting *Phillips*, 494 F.3d at 383-84); *see also Zeppelin Sys. USA, Inc. v. Pyrolyx USA Indiana, LLC*, No. 19-cv-11222, 2020 WL 1082774, at *3 (S.D.N.Y. Mar. 5, 2020) (applying this four-part framework on a 12(b)(2) motion to dismiss); *Gordian Grp.*, 168 F. Supp. 3d at 581 (same).

Indeed, "[f]orum selection clauses are *prima facie* valid" and should generally be enforced. *See Magi XXI*, 714 F.3d at 720-21; *see also Martinez*, 740 F.3d at 218 (noting that "[t]he presumptive enforceability of forum selection clauses reflects a strong federal public policy of its own"). As the Supreme Court has explained, "[t]he enforcement of valid forum-selection clauses, bargained for by the parties, protects their legitimate expectations and furthers vital interests of the justice system," and should therefore be "given controlling weight in all but the most exceptional cases." *Atl. Marine Constr. Co. v. U.S. Dist. Court for the W. Dist. of Tex.*, 571 U.S. 49, 63 (2013) (internal quotation marks and citations omitted).[14] This is especially so where the forum selection clause is the result of an arms-length transaction, as here. *See Magi XXI*, 714 F.3d at 721 ("We give substantial deference to the forum selected by the parties, particularly where this choice was made in an arm's-length negotiation by experienced and sophisticated businessmen.") (internal quotation marks and citation omitted); *Zeppelin Sys.*, 2020 WL 1082774, at *3 ("[C]ourts should do no 'more than give effect to the legitimate expectations of the parties, manifested in their freely negotiated agreement.'") (quoting *M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 12 (1972)); *see also Atl. Marine*, 571 U.S. at 64 ("When parties agree to a forum-selection clause, they waive the right to challenge the preselected forum as inconvenient or less convenient for themselves or their witnesses, or for their pursuit of the litigation.").

---

[14] Although *Atlantic Marine* addressed a motion to transfer under 28 U.S.C. § 1404(a), its analysis is similarly applicable with respect to the enforcement of the forum selection provisions at issue here.

The Court concludes that the forum selection clauses in St. Etienne's agreements are valid and enforceable, and that St. Etienne voluntarily consented to personal jurisdiction in this District by signing the APA and the Non-Compete Agreement. *See Brown v. Lockheed Martin Corp.*, 814 F.3d 619, 625 (2d Cir. 2016) ("[U]nlike subject matter jurisdiction, a party may simply consent to a court's exercise of personal jurisdiction: for example, an entity may contract or stipulate with another to permit proceedings in a state's courts, notwithstanding the remoteness from the state of its operations and organization."). It is undisputed that St. Etienne's Non-Compete Agreement contains a New York forum selection provision, which provides that "[a]ny permissible action at law, suit in equity, or other judicial proceedings for the enforcement of this Agreement, or related to any provision of this Agreement, shall be instituted only in a federal or state court located in New York, New York." Non-Compete § 8. And, while the APA contains a mandatory arbitration provision, it also includes a New York choice of law provision, *see* APA § 18.3, and the arbitration provision itself provides that a party "may seek from a court an order to compel arbitration, or any other interim relief or provisional remedies pending an arbitrator's resolution of any controversy or claim," and that "[a]ny such action or proceeding will be arbitrated within the jurisdiction of the state or Federal courts located in New York, New York." *See* APA § 18.4. Furthermore, there is no dispute that these provisions were "reasonably communicated" to St. Etienne when he signed the APA and the Non-Compete Agreement, or that they are mandatory. *See Zeppelin Sys.*, 2020 WL 1082774, at *3. And, for the reasons discussed below, the Court also determines that NuMSP, St. Etienne, and the claims in this action are subject to these forum selection provisions.

There is good reason to enforce the forum selection clauses against St. Etienne. As noted, forum selection clauses "further vital interests of the justice system, including judicial economy and efficiency, ensure that parties will not be required to defend lawsuits in far-flung fora, and

promote uniformity of result." *Martinez*, 740 F.3d at 219; *see also LaRoss Partners, LLC v. Contact 911 Inc.*, 874 F. Supp. 2d 147, 153 (E.D.N.Y. 2012) ("Forum selection clauses play a crucial role in ensuring predictability in contract formation."); *In re Refco Inc., Sec. Litig.*, No. 07-MDL 1902 (JSR), 2009 WL 5548666, at *5 (S.D.N.Y. Nov. 16, 2009) ("Both the Supreme Court and the Second Circuit have recognized that forum selection clauses have economic value and should be enforced in accordance with the expectations of the parties."). In the Second Circuit, a forum selection clause is enforceable unless "(1) its incorporation was the result of fraud or overreaching; (2) the law to be applied in the selected forum is fundamentally unfair; (3) enforcement contravenes a strong public policy of the forum in which suit is brought; or (4) trial in the selected forum will be so difficult and inconvenient that the plaintiff effectively will be denied of his day in court." *Martinez*, 740 F.3d at 228 (quoting *Phillips*, 494 F.3d at 392) (internal quotation marks omitted).[15] St. Etienne has not established that any of these circumstances are present here. Rather, the APA—and by extension, the Non-Compete Agreement—was the "product of a sophisticated asset sale transaction wherein St. Etienne was represented by counsel and received significant compensation," *see* Pl. Opp'n at 12; APA § 18.15, and the Court discerns no reason not to hold him to his bargain.

St. Etienne has also not satisfied his burden of demonstrating that enforcement of the forum selection provisions would be "unreasonable or unjust," or that any "fraud or overreaching" was involved in the execution of the agreements. *See Magi XXI*, 714 F.3d at 721. Contrary to his assertions, Louisiana state law is not relevant to this Court's determination of whether to enforce,

---

[15] At oral argument, counsel for McAllister and ProTek argued that the third element articulated in *Phillips* and *Martinez* "goes to comparing the interest of the two competing states," that is, "does New York have a compelling strong public interest in regulating competition in Louisiana, or does Louisiana have the stronger public policy and need to regulate its own competition." *See* Tr. at 15. But as explained further below, *Martinez* says nothing of comparing the laws or interests of two conflicting states and, to the contrary, clearly directs courts to consider the public policy of the *forum state*.

or how to interpret, the forum selection clauses in the APA or the Non-Compete Agreement.  At

oral argument, St. Etienne asserted that New York courts are guided by the Restatement (Second)

of Conflict of Laws, providing that "a chosen state in a forum selection clause applies unless a

party can show two things: one, that the chosen state has no substantial relationship to the party or

the transaction; and, two, that the application of law of the chosen state would be contrary to

fundamental policy of the state that has a materially greater interest than the chosen state."  *See*

Tr. at 11-12.  He argued further, as to the second prong, that "applying the law of New York [] is

contrary to the fundamental policy of Louisiana, which disfavors forum selection clauses [and

choice of law provisions] other than Louisiana . . . when they're being applied against Louisiana

employees," Tr. at 12, and directed the Court to *Signature Financial LLC v. Neighbors Global*

*Holdings, LLC*, 281 F. Supp. 3d 438 (S.D.N.Y. 2017) and *Katz v. Berisford International PLC*,

No. 96 Civ. 8695 (JGK), 2000 WL 959721 (S.D.N.Y. July 10, 2000), which he also cites in his

reply brief.  *See* Tr. at 13; St. Etienne Reply at 3.  But in determining whether a forum selection

provision is invalid, the Court focuses on the public policy of the *forum state*, not some other state.

*See Martinez*, 740 F.3d at 228 (explaining that a court may decline to enforce a forum selection

clause if, among other things, "enforcement contravenes a strong public policy of *the forum in*

*which suit is brought*") (emphasis added) (internal quotation marks and citation omitted).[16]  In

---

[16] The cases St. Etienne cites lend him no support.  In *Signature Financial*, the court applied New York law—the law of the forum state—to determine whether the forum selection clause was enforceable, which it noted was also "consistent with the clear rule in the Second Circuit that '[i]n diversity cases, the issue of personal jurisdiction is governed by the law of the forum state.'"  281 F. Supp. 3d at 445 (quoting *D.H. Blair*, 462 F.3d at 104).  The court then held that the provision at issue was indeed enforceable, explaining that under New York law, "parties to a contract may freely select a forum which will resolve any disputes over the interpretation or performance of the contract," that such provisions in a contract are "prima facie valid and enforceable unless shown by the resisting party to be unreasonable," and that "New York courts have specifically found that forum selection clauses can be relied upon to establish personal jurisdiction over out-of-state defendants who otherwise would not be liable to suit in New York."  *Id.* at 446.  *Signature Financial* did not discuss or rely on the Restatement at all.  And in *Katz*, the conflict of law issue arose because the substantive law of the forum state, i.e. New York, and that provided for in the agreement's choice of law provision, i.e. English law, differed.  *See* 2000 WL 959721, at *7.  Here, there is no conflict because the law of the forum state is the same as the law provided for in the choice of law provisions.  The parties in *Katz* agreed, moreover, that the contract was governed by English law.  *See id.* at *2.  The court cited the Restatement only to

*Zeppelin Systems USA, Inc. v. Pyrolyx USA Indiana, LLC*, for instance, the court rejected the defendant's argument—raised on a 12(b)(2) motion—that despite a New York forum selection clause, Indiana law "void[s] any agreement requiring parties to litigate [their] disputes outside of the state." *See* 2020 WL 1082774, at *3.  As the court explained, because "Indiana is not the forum state, . . . Indiana's disapproval of out-of-state forum selection clauses is not relevant in determining if enforcement of the forum selection clause 'would contravene a strong public policy of *the forum*.'" *See id.* at *4 (quoting *M/S Bremen*, 407 U.S. at 15).  The court thus looked only to the public policy of New York, i.e., the forum state, to determine whether enforcement contravened public policy, and found that it did not.  *See id.*

In sum, St. Etienne's voluntary consent to these contractual forum selection provisions is sufficient to establish that the Court has personal jurisdiction over him.  *See, e.g.*, *GlaxoSmithKline*, 2019 WL 293329, at *3-4.  Furthermore, St. Etienne's consent to personal jurisdiction in New York applies to both NuMSP's contract and non-contract claims against him. *See BMW of N. Am. LLC v. M/V Courage*, 254 F. Supp. 3d 591, 597 (S.D.N.Y. 2017) ("The Second Circuit has held that a contract-oriented forum selection clause does extend to tort claims between the parties if the claims 'ultimately depend on the existence of a contractual relationship between the signatory parties.'") (quoting *Magi XXI*, 714 F.3d at 724); *Citi Structure Constr. v. Zurich Am. Ins. Co.*, No. 14-CV-5371 (RA), 2015 WL 4934414, at *2 (S.D.N.Y. Aug. 18, 2015) ("The Second Circuit has held consistently that forum selection clauses are to be interpreted broadly and are not restricted to pure breaches of the contracts containing the clauses.") (citations omitted).

---

support its conclusion that English law governed the agreement because "[t]he law of the state chosen by the parties to govern their contractual rights and duties will be applied if the particular issue is one which the parties could have resolved by an explicit provision in their agreement directed to that issue."  *See id.* at *8.

### 2. The APA's Mandatory Arbitration Provision Controls

Although St. Etienne consented to personal jurisdiction in this District under the APA and the Non-Compete Agreement, the inquiry does not end there.  This is so because the APA, which appears to be the controlling agreement, contains a mandatory arbitration provision.  The Court disagrees with NuMSP's assertion that the arbitration provision in the APA "applies only to claims for a breach of the terms of the asset sale transaction by which NuMSP acquired St. Etienne's business," and has "no applicability to NuMSP's claims here for Defendants' wrongful competition and other misconduct after the asset sale transaction closed, which are governed by St. Etienne's Non-Competition Agreement."  *See* Pl. Opp'n at 8-9.  It seems clear based on the plain language of the two agreements that the Non-Compete Agreement was intended to be *part of* the APA, and that the APA was intended to be the main agreement between the parties.

The APA clearly states that "[a]ll Schedules and other attachments or Closing Date documents signed referenced in this Agreement are part of this Agreement and are incorporated herein by reference," APA § 18.11, and that the APA, "with its Schedules and all related Closing Date transaction documents[,] constitutes the entire agreement among the Parties and supersedes any prior agreement or understanding, whether oral or written, among the Parties concerning its subject matter," APA § 18.12.  Although "Closing Date documents" does not seem to be defined in the Agreements, Section 5 of the APA, which covers St. Etienne's obligation to deliver the "Noncompetition Agreements" at Closing, is entitled "Documents and Other Instruments to Be Delivered On the Closing Date" and therefore seems to contemplate the very "Closing Date documents" that are required by and incorporated into the APA.  NuMSP does not dispute that the Non-Compete Agreement was attached to the APA, *see* Tr. at 31, and in fact alleges in the Complaint that it served as "*further protection* for the assets and business that NuMSP was purchasing from St. Etienne."  *See* Compl. ¶ 21 (emphasis added).  Indeed, it was specifically "in

connection with the closing of the [APA]" that St. Etienne "executed and delivered to NuMSP" the Non-Compete Agreement.  *See id.*  The Court thus determines that the Non-Compete Agreement was expressly incorporated by reference into and superseded by the APA.[17]

The APA and the Non-Compete Agreement must be "read and interpreted together, since they were executed the same day, involved the same parties, and served the same [or similar] purpose[s]."  *Union Capital*, 2016 WL 8813991, at *3 (internal quotation marks and citation omitted); *see also Adar Bays, LLC v. Aim Expl., Inc.*, 251 F. Supp. 3d 704, 708 (S.D.N.Y. 2017) ("Where interrelated agreements contain competing forum selection clauses, a Court must avoid an interpretation that renders a provision of either agreement superfluous.") (alterations, internal quotation marks, and citation omitted).  Where there are two "different contracts, each containing a forum selection clause designating a different forum, and the parties do not dispute the facts which gave rise to those two conflicting contracts, the court must decide as a matter of law . . . which forum selection clause governs."  *Asoma Corp. v. SK Shipping Co., Ltd.*, 467 F.3d 817, 822 (2d Cir. 2006).  Here, because the APA is the main agreement, its forum selection clause—that is, the mandatory arbitration provision—governs.  *See, e.g., Encompass Aviation, LLC v. Surf Air Inc.*, No. 18 Civ. 5530 (CM), 2018 WL 6713138, at *7-8 (S.D.N.Y. Nov. 30, 2018) (finding that

---

[17] There is ample evidence to further support the conclusion that the APA is the main agreement between the parties. For instance, the preamble to the Non-Compete Agreement states that "[c]apitalized terms not defined herein shall have the meaning given to them in the Asset Purchase and Sale Agreement dated December 3, 2018 between [NuMSP] and the Seller Parties."  Additionally, as noted, St. Etienne agreed pursuant to the APA to deliver "Noncompetition Agreements" signed by UTSI and St. Etienne "with the restrictive covenants contained in Section 15 of this Agreement."  APA § 5.1(g).  Section 15, in turn, provides that, for a period of three years from the Closing Date, the "Seller Parties" and/or "any other entity owned in full or part directly or indirectly by the Seller Parties" shall not compete with NuMSP within the state of Louisiana or solicit any of NuMSP's customers.  *See* APA §§ 15.1, 15.3, 15.4.  These terms are substantially similar to the terms set forth in Section 1 of St. Etienne's Non-Compete Agreement, which provides that "[i]n consideration of the payments" made to St. Etienne under the APA, St. Etienne agreed not to "directly or indirectly either individually, in partnership, jointly, or in conjunction with any Person, firm, or entity" compete with NuMSP or solicit NuMSP's customers for a three-year period.  *See* Non-Compete § 1. Consistent with this, NuMSP alleges that Section 1 of the Non-Compete "mirrors the non-compete and non-solicitation provisions set forth in the [APA]" itself.  *See* Compl. ¶ 23.

the forum selection clause in one of the several agreements entered into by the parties, the MIPA, controlled plaintiff's claims since, among other things, the MIPA provided that "it intended to supersede the other agreements," "specifically incorporate[d] the other agreements by reference," and it was "reasonable to conclude" that the other agreements were "'ancillary' to the MIPA").[18] The Court thus concludes that the APA's mandatory arbitration provision—*not* the Non-Compete Agreement's New York forum selection clause—controls the dispute between St. Etienne and NuMSP. As such, the Court must next address St. Etienne's "alternative" request to compel arbitration pursuant to 9 U.S.C. § 4 and stay this action.

### B. Mandatory Arbitration

The Federal Arbitration Act ("FAA") provides that an arbitration provision in "a contract evidencing a transaction involving commerce . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. The FAA "establishes a national policy favoring arbitration when the parties contract for that mode of dispute resolution." *Preston v. Ferrer*, 552 U.S. 346, 349 (2008). Under Section 4 the FAA, a party to an arbitration agreement may petition a district court for "an order directing that . . . arbitration proceed in the manner provided for in such agreement." 9 U.S.C. § 4. In deciding whether to compel arbitration, a court must consider "(1) whether the parties have entered into a valid agreement to arbitrate, and, if so, (2) whether the dispute at issue comes within the scope of the arbitration agreement." *In re Am. Express Fin. Advisors Sec. Litig.*, 672 F.3d 113, 128 (2d Cir. 2011). The party moving to compel arbitration "must make a prima facie initial showing that an agreement to arbitrate existed before the burden shifts to the party opposing arbitration to put the

---

[18] For these reasons, the Court also agrees with St. Etienne that the NDA, like the Non-Compete Agreement, is "a document that forms part of the APA, as it is another 'Closing Date document' referenced in and incorporated into the APA." *See* St. Etienne Mot. at 10.

making of that agreement 'in issue.'" *Hines v. Overstock.com, Inc.*, 380 F. App'x 22, 24 (2d Cir. 2010).  This burden does not require the movant to show the "agreement would be *enforceable*, merely that one existed."  *Id.*  If this showing is made, "the party seeking to avoid arbitration generally bears the burden of showing the agreement to be inapplicable or invalid."  *Begonja v. Vornado Realty Tr.*, 159 F. Supp. 3d 402, 409 (S.D.N.Y. 2016) (internal quotation marks and citation omitted).  "Once a court is satisfied that an arbitration agreement is valid and the claim before it is arbitrable, it must stay or dismiss further judicial proceedings and order the parties to arbitrate."  *See Nunez v. Citibank, N.A.*, No. 08 Civ. 5398 (BSJ), 2009 WL 256107, at *2 (S.D.N.Y. Feb. 3, 2009).

NuMSP does not dispute that the parties entered into a valid agreement to arbitrate under the APA.  Instead, NuMSP appears to take issue with whether the dispute before this Court "comes within the scope of" the APA's arbitration provision.  As already discussed, however, the Court disagrees with NuMSP's assertion that the APA's arbitration provision has "no applicability to NuMSP's claims here."  To the contrary, the claims asserted by NuMSP in this action arise from, among other things, St. Etienne's alleged breaches of the APA.  *See, e.g.*, Compl. ¶¶ 17-18, 81-82, 85-88.  NuMSP confirmed at oral argument that St. Etienne agreed to execute the Non-Compete Agreement "as part of" the asset sale transaction, *see* Tr. at 26-27, and that the APA itself contains language that "essentially mirrors the language" in the Non-Compete Agreement, *see id.* at 31-32. Accordingly, NuMSP brings claims against St. Etienne based on his alleged breaches of the non-competition and non-solicitation provisions in the APA, as well as other alleged breaches.  The instant dispute therefore "comes within the scope of" the APA's arbitration clause, and NuMSP's claims against St. Etienne are subject to the APA's mandatory arbitration provision.

Lastly, the Court disagrees with NuMSP's argument that even if the arbitration provision in the APA controls, it is nonetheless "entitled to seek temporary and preliminary injunctive relief from this Court." *See* Pl. Opp'n at 9. NuMSP points to Section 18.4 of the APA as "expressly allow[ing] a party to seek 'interim relief or provisional remedies' from a court." *See id.* But reading the entirety of Section 18.4, the Court concludes that it does not provide NuMSP with the basis to seek the "interim relief" it now pursues. Instead, that section provides that a party "may seek from a court an order to compel arbitration, or any other interim relief or provisional remedies *pending an arbitrator's resolution of any controversy or claim*." APA § 18.4 (emphasis added).[19] The Court also rejects NuMSP's apparent attempt to alter the words of this provision, suggesting at oral argument that it may seek injunctive relief from this Court "pending *the filing* of an arbitration and an arbitrator's decision on the merits." *See* Tr. at 29 (emphasis added). Section 18.4 clearly contemplates that an arbitration would actually be pending before a party could seek "interim relief or provisional remedies" from a court, not merely that it would or could be filed at some point in the future. As there is no pending arbitration here, the Court determines that NuMSP cannot seek "interim relief or provisional remedies" under Section 18.4 of the APA at this time.

For these reasons, St. Etienne's request to compel arbitration is granted, and this action is stayed as to St. Etienne pending resolution of the arbitration.[20]

---

[19] The applicable AAA rules specifically provide that the "arbitrator may take whatever interim measures he or she deems necessary, including injunctive relief and measures for the protection or conservation of property[.]" *See* Commercial Arbitration Rule 37(a). Moreover, the FAA "establishes 'as a matter of federal law' that 'any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration.'" *Phillips*, 494 F.3d at 389 (quoting *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 626 (1985)). Section 17 of the APA, in connection with Section 18.4, leads to the conclusion that the parties may indeed seek injunctive or other equitable relief from the arbitrator in the first instance.

[20] Because the Court grants St. Etienne's motion to compel arbitration, it need not address his other bases for dismissal. *See, e.g., Scone Invs., L.P. v. Am. Third Market Corp.*, 992 F. Supp. 378, 379 (S.D.N.Y. 1998).

II.     **Defendants Raymond, McAllister, and ProTek's Motions**

In its Complaint, NuMSP alleges that Defendants Raymond, McAllister and ProTek are "bound" by the forum selection provision in St. Etienne's Non-Compete Agreement because "they conspired with St. Etienne to act together in conduct that violated his Non-Compete Agreement against the interests of NuMSP and it was reasonably foreseeable that their conduct would implicate the Non-Compete Agreement and bind them to its forum selection provision."  Compl. ¶ 7.  It is undisputed that none of these defendants were a party to the APA or the Non-Compete Agreement.  In fact, McAllister and ProTek are not parties to any agreement with NuMSP, and the only agreement to which Raymond is a party is his individual Non-Disclosure Agreement, which has a New Jersey forum selection clause.  *See* Raymond NDA § 8.  In its opposition, NuMSP nonetheless expands on its allegation in paragraph 7 of the Complaint, arguing that this Court has personal jurisdiction over Raymond, McAllister, and ProTek because they all allegedly "conspired with St. Etienne," and are thus "engaged in a common, wrongful scheme to solicit and steal the very customer relationships that St. Etienne sold to NuMSP and which St. Etienne agreed . . . not [to] solicit for a period of three years ending in December 2021."  *See* Pl. Opp'n at 6, 8.  Based only on this alleged conspiracy and the forum selection clause in St. Etienne's Non-Compete Agreement, NuMSP asserts that this Court has personal jurisdiction over Raymond, McAllister, and ProTek.  The Court disagrees.

As a preliminary matter, the forum selection clause in St. Etienne's Non-Compete Agreement does not control NuMSP's claims in the instant action, as discussed above.  And even if it did, Raymond, McAllister, and ProTek cannot be "bound" by the forum selection clause in that agreement.

It is well settled that "the fact [that] a party is a non-signatory to an agreement is insufficient, standing alone, to preclude enforcement of a forum selection clause."  *Aguas Lenders*

*Recovery Grp. v. Suez, S.A.*, 585 F.3d 696, 701 (2d Cir. 2009).  As such, "forum selection clauses

may bind non-signatories" under certain circumstances.  *See Overseas Ventures, LLC v. ROW*

*Mgmt., Ltd., Inc.*, No. 12 Civ. 1033 (PAE), 2012 WL 5363782, at \*5 (S.D.N.Y. Oct. 26, 2012).  In

order to bind a non-signatory to a forum selection clause, however, the non-signatory must be

"closely related" to a signatory of the agreement.  *See Casville Invs., Ltd. v. Kates*, No. 12 Civ.

6968 (RA), 2013 WL 3465816, at \*5 (S.D.N.Y. July 8, 2013).  The key inquiry in the "closely

related" analysis is whether "enforcement of the forum selection clause is foreseeable by virtue of

the relationship between the signatory and the party sought to be bound." *Yeda Research & Dev.*

*Co. Ltd. v. iCAD, Inc.*, No. 18 Civ. 8083 (GBD), 2019 WL 4562409, at \*6 (S.D.N.Y. Sept. 5, 2019)

(citation omitted); *see also, e.g.*, *Prospect Funding Holdings, LLC v. Vinson*, 256 F. Supp. 3d 318,

325 (S.D.N.Y. 2017) ("[T]he enforcement of the forum selection clause against the non-party must

have been foreseeable prior to suit, which implies that the non-signatory must have been otherwise

involved in the transaction in some manner.") (citation omitted).  In particular, the "relevant

question" is whether it was reasonably foreseeable that "the non-signatory would be bound by the

forum selection clause," not whether it was reasonably foreseeable that there would be a

"contractual dispute with a signatory." *See Prospect Funding Holdings*, 256 F. Supp. 3d at 325.

Contrary to NuMSP's assertions, Raymond, McAllister, and Protek are not "closely

related" to St. Etienne.  NuMSP contends that because Raymond, McAllister, and ProTek

"conspired with" St. Etienne "to act together in conduct that violated his [Non-Compete]

Agreement against the interests of NuMSP, it was reasonably foreseeable that their conduct would

result in a lawsuit naming them as co-conspirators." *See* Pl. Opp'n at 8.  NuMSP does not even

allege, however, that these Defendants were aware of St. Etienne's Non-Compete Agreement in

general, or its forum selection clause in particular, and to the contrary, all assert that they were not.

*See, e.g.*, Raymond Decl. ¶ 23 ("I have no knowledge about David St. Etienne's employment-related agreements with NuMSP, nor do I know any of the terms associated with any such agreements.  I have no knowledge of any forum selection clause in any such agreements."); McAllister Aff. ¶ 24 ("Outside of this litigation, I have never seen a contract between David St. Etienne or Kenneth Raymond and NuMSP."); *id.* ¶ 26 ("I have not been informed, nor have I inquired, about the details of David St. Etienne's sale of his company to NuMSP.  The first time I heard of any of the contracts referenced in the Complaint was just before the Complaint was filed by way of a Cease and Desist letter from NuMSP's counsel.").  It would therefore be difficult to conclude that it was "reasonably foreseeable" to any of them that they would be bound by such a forum selection clause.

"A non-signatory is 'closely related' if its interests are 'completely derivative' of and 'directly related to, if not predicated upon' the signatory party's interests or conduct."  *See Yeda Research*, 2019 WL 4562409, at *6 (citations omitted).  Courts in this district have "generally found such 'close relationship' in two kinds of situations: (1) 'where the non-signatory had an active role in the transaction between the signatories,' or (2) 'where the non-signatory had an active role in the company that was the signatory."  *See Vuzix Corp. v. Pearson*, No. 19 Civ. 689 (NRB), 2019 WL 5865342, at *5 (S.D.N.Y. Nov. 6, 2019) (quoting *Affiliated FM Ins. Co. v. Kuehne + Nagel, Inc.*, 328 F. Supp. 3d 329, 336 (S.D.N.Y. 2018) (collecting cases)).  Some courts have also found that "[n]on-signatory alter-egos, corporate executive officers, and successors-in-interest," as well as "third-party beneficiar[ies] to a contract" could, under certain circumstances, satisfy the "closely related" test.  *See id.*; *Trodale Holdings LLC v. Bristol Healthcare Inv'rs, L.P.*, No. 16 Civ. 4254 (KPF), 2017 WL 5905574, at *8 (S.D.N.Y. Nov. 29, 2017); *see also Prospect Funding Holdings*, 256 F. Supp. 3d at 325 ("The vast majority of cases that have found a non-signatory

bound by a forum selection clause under the theory that they are 'closely related' to the signatory or the dispute have done so where the non-signatory had an active role in the transaction between the signatories or where the non-signatory had an active role in the company that was the signatory.").  None of these circumstances are present here.  There are no allegations, for instance, that any of these Defendants had any involvement in the purchase of St. Etienne's business by NuMSP, or with the execution of the APA or the Non-Compete Agreement.  There are also no allegations that any of these Defendants are "successors-in-interest," in an "alter-ego relationship" with St. Etienne, or third-party beneficiaries to any of St. Etienne's agreements.  Nor is there evidence upon which the Court could conclude that the interests of these Defendants are "'completely derivative' of and 'directly related to, if not predicated upon'" St. Etienne's conduct.

NuMSP's reliance on *Synthes, Inc v. Emerge Medical Inc.*, 887 F. Supp. 2d 598 (E.D. Pa. 2012)—an out-of-circuit district court case—is misplaced.  *See* Pl. Opp'n at 6-7; Compl. ¶ 7. NuMSP contends that *Synthes* "held that non-signatories to a contract were bound by its forum selection clause under facts very similar to those presented here."  *See* Pl. Opp'n at 6.  But *Synthes* is distinguishable because there, the court found that the non-signatory "clearly knew of the existence of the [signatory's] Non-Competition Agreements," which contained the forum selection provision at issue.  *See Synthes*, 887 F. Supp. 2d at 615.  The court found further, based on the evidence before it, that the non-signatory "understood that [those agreements] impacted his efforts to form and operate [the competitor] with [the signatories]," "actively sought out ways to evade the legal implications of those contracts," and "had concerns about potential litigation regarding those contracts."  *See id.*  In concluding that the plaintiff had established that the non-signatory was "so 'closely related' to the present dispute as to make it foreseeable that he would be bound by the forum selection clauses," it was not just that "[the non-signatory] worked closely with [the

signatories] . . . to compete in violation of [their] Non-Competition Agreements," but also that "[t]hroughout their collaboration, the Non-Competition Agreements were a source of frequent discussion, requiring the assistance of outside counsel."  *See id.* at 610-12.  Importantly, the non-signatory was "well aware" of the non-compete agreements that contained the relevant forum selection provisions, and "conspired with" the signatories to form a competitor company "notwithstanding [his] *obvious knowledge* of the explicit non-competition provisions in [the signatories'] contracts."  *See id.* at 616 (emphasis added).  It was with that knowledge and awareness on the non-signatory's part that the court concluded that the non-signatory could be bound to the relevant contract.  No such awareness or knowledge is established here.  In short, NuMSP has set forth no allegations—aside from its own speculation about the relationship among the Defendants—or facts on which the Court could conclude that enforcement of the New York forum selection clause in St. Etienne's Non-Compete Agreement was reasonably foreseeable to Raymond, McAllister, or ProTek.[21]

Because Raymond, McAllister, and ProTek are not bound by the Non-Compete Agreement's forum selection clause, the Court must analyze whether personal jurisdiction can be

---

[21] The other cases cited by NuMSP in its opposition are likewise inapposite.  In *Aguas Lenders Recovery Group v. Suez, S.A.*, 585 F.3d 696 (2d Cir. 2009), the Circuit held that a non-signatory successor in interest to a signatory of a contract was subject to the mandatory forum selection clause in the contract.  *See id.* at 701.  In *Magi XXI, Inc. v. Stato della Citta del Vaticano*, 714 F.3d 714 (2d Cir. 2013), the Circuit affirmed the district court's judgment and held that the signatory and non-signatory were "closely related" because, among other things, the non-signatory was "known . . . as the source of the contractual authority granted" by the relevant agreements, and the agreements "specifically provided for the extensive and continuing involvement of [the non-signatory]."  *Id.* at 724.  And unlike in *Universal Grading Service v. eBay, Inc.*, No. 08-CV-3557 (CPS), 2009 WL 2029796 (E.D.N.Y. June 10, 2009), NuMSP's claims here are not "substantially identical with regard to each defendant."  *See id.* at *17.  Finally, Defendants appear to be more akin to the signatory's mother in *Diamond v. Calaway*, No. 18 Civ. 3238 (KPF), 2018 WL 4906256 (S.D.N.Y. Oct. 9, 2018), who the court concluded was not bound by the forum selection clause, than the signatory's wife, who the court concluded was.  *See id.* at *4-6.  In any event, in *Diamond*, the court determined that enforcement of the forum selection provision was reasonably foreseeable to the signatory's wife not only because of her "close relationship" to her husband, but also because "the pleadings suggest[ed] that [she] was intimately involved in the scheme to defraud Plaintiff," she "knowingly participated in that scheme, including by making her personal bank account available to advance the fraud," and her "participation began before Plaintiff had wired any funds" to her and her husband.  *Id.* at *5.  The "alleged participation" by the signatory's mother, on the other hand, was "largely peripheral" and "only materialized after the contracts were executed and the funds transferred."  *Id.* at *6.

established under New York state law, and if so, whether an exercise of jurisdiction is consistent with federal due process requirements.  *See Overseas Ventures*, 2012 WL 5363782, at *3.

The Court's first step in this analysis is governed by New York's long-arm statute, N.Y. C.P.L.R. § 302.  Under New York's long-arm statute, "a court may exercise personal jurisdiction over any non-domiciliary . . . who in person or through an agent: (1) transacts any business within the state or contracts anywhere to supply goods or services in the state; or (2) commits a tortious act within the state . . . ; or (3) commits a tortious act without the state causing injury to person or property within the state, . . . if he (i) regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in the state, or (ii) expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce; or (4) owns, uses or possesses any real property situated within the state."  N.Y. C.P.L.R. § 302(a).  As McAllister and ProTek rightly point out in their joint motion, however, "NuMSP has made no effort to satisfy either the long-arm [statute] or the due process requirements."  *See* McAllister/ProTek Mot. at 9.  In fact, NuMSP's only reference to the New York long-arm statute or constitutional requirements of due process is its assertion that, "[b]ecause St. Etienne agreed in his Non-Competition Agreement to litigate before this Court, 'it is not necessary to analyze jurisdiction under New York's long-arm statute or federal constitutional requirements of due process.'"  *See* Pl. Opp'n at 3.  NuMSP makes no reference to these principles with respect to the other Defendants.[22]

---

[22] And at oral argument, NuMSP confirmed that it was relying solely on the forum selection clause and the "closely related" doctrine to establish personal jurisdiction over Raymond, McAllister, and ProTek.  *See* Tr. at 21.

NuMSP would be hard pressed to argue that New York's long-arm statute provides this Court with personal jurisdiction over Raymond, McAllister, or ProTek.  It is undisputed that Raymond and McAllister are Louisiana residents—and Louisiana citizens for diversity jurisdiction purposes—*see* Compl. ¶¶ 3-4, and that ProTek is a Louisiana corporation with its place of business in New Orleans, Louisiana, *see id.* ¶¶ 5, 38.  In their affidavits, Defendants make clear that they have no connections whatsoever to the state of New York.  For instance, Raymond asserts that he has resided in Louisiana "continuously since 1999," that he worked for NuMSP "entirely in Louisiana," that he has never resided or worked in New York, that he owns no property in New York, that he has no residence in or business connection to New York, and that he does not transact business or supply goods or services in New York.  *See* Raymond Decl. ¶¶ 2-3.  Raymond asserts further that he has not "committed [any] tortious act in New York or [any such act] outside the state that caused injury to a person or property within the state."  *See* Raymond Mot. at 6.  Similarly, McAllister and ProTek argue that they do not "have any physical, contractual, or business presence in New York," and that they were not "privy to" or "even aware of" St. Etienne's Non-Compete Agreement.  *See* McAllister/ProTek Mot. at 1; McAllister/ProTek Reply at 2.  While McAllister acknowledges that he "personally [has] visited New York and done business in New York," he asserts that he has not done so "related to ProTek or even I.T. work generally."  *See* McAllister Aff. ¶ 28.  As to ProTek, McAllister maintains that he formed the company in January 2020, that its only office is located in Louisiana, that "all of its business is conducted inside of the New Orleans Metropolitan Area," that it has no contracts or clients in New York, and that it "does not provide work in New York."  *See* McAllister Aff. ¶¶ 10, 27.  Even when confronted with these assertions, NuMSP has failed to allege or set forth any facts to establish that these Defendants have availed themselves of the New York forum in any way.

The Court thus concludes that it lacks personal jurisdiction over these Defendants under New York law.  Because jurisdiction is lacking under New York law, the Court need not address whether it would be consistent with federal due process requirements.  *See DH Servs., LLC v. Positive Impact, Inc.*, No. 12 Civ. 6153 (RA), 2014 WL 496875, at *2 (S.D.N.Y. Feb. 5, 2014). Accordingly, this action must be dismissed as to Raymond, McAllister, and ProTek for lack of personal jurisdiction.[23]

### III.     NuMSP's Motion for a Temporary Restraining Order and Preliminary Injunction

Because the Court concludes that this action must be dismissed as to Raymond, McAllister, and ProTek, and that arbitration must be compelled as to St. Etienne, the Court will not separately address NuMSP's motion for a temporary restraining order and preliminary injunction as it denies that motion for the reasons stated above.  *See, e.g.*, *Kirmani v. Bill Wolf Petroleum Co.*, No. 16-cv-7550 (CM), 2016 WL 7190077, at *7 (S.D.N.Y. Nov. 22, 2016).

---

[23] Because the Court grants Raymond, McAllister, and Protek's motions under Rule 12(b)(2), it need not address their alternative grounds for dismissal.  *See, e.g.*, *Yeda Research*, 2019 WL 4562409, at *1 n.1; *Gordian Grp.*, 168 F. Supp. 3d at 577.

**CONCLUSION**

For the reasons set forth above, Defendants Raymond, McAllister, and ProTek's motions to dismiss for lack of personal jurisdiction are granted, and Defendant St. Etienne's motion to compel arbitration is granted.  Because the Court compels this action to arbitration and/or dismisses it for lack of personal jurisdiction, it does not address Defendants' alternative bases for dismissal.  NuMSP's motion for a temporary restraining order and preliminary injunction is denied as well, for the reasons stated above.

The Clerk of Court is respectfully directed to terminate the motions pending at Dkts. 2, 10, 11, and 14; dismiss Defendants Raymond, McAllister, and ProTek from the case; and stay this action pending resolution of the arbitration between NuMSP and St. Etienne.

SO ORDERED.

Dated:   May 22, 2020
         New York, New York

_____
Ronnie Abrams
United States District Judge